**In re Shugei Nalei GILLIS, also known as Shugei N. Gillis, also known as S. Nalei Brooks, Debtor.**

**Bankruptcy No. 85–00095.**

United States Bankruptcy Court, D. Hawaii.

Oct. 19, 1988.

Barry Ziker, Honolulu, Hawaii, for movant.

Glenn Miyajima, Honolulu, Hawaii, for creditor.

Edwin J. Kelly, Kailua, Hawaii, Trustee.

Ronald K. Kotoshirodo, Honolulu, Hawaii, for debtor.

JON J. CHINEN, Bankruptcy Judge.

These Findings of Fact, Conclusions of Law and Order deal with the Application for Payment of Administrative Expense and Adjudication of Continued Motions ("Application for Payment") originally filed on September 2, 1987 by Henry A. Gomes, Trustee of the Gomes Land Trust ("Gomes") and which, on October 2, 1987, was continued until moved on, and the Motion for Interest on Funds Previously held by Hawaii National Bank ("Motion for Interest"), filed by Edwin J. Kelly, the Trustee in this Chapter 7 proceeding, on April 13, 1988. Hearings on the Application for Payment and on the Motion for Interest were held on April 29, and July 15, 1988. Barry G. Ziker, Esq., appeared on behalf of the movant, Gomes, Ronald K. Kotoshirodo, Esq., appeared on behalf of the debtor, Shugei Nalei Gillis ("Gillis"), Glenn National Bank ("Bank") and Edwin J. Kelly appeared as Chapter 7 trustee.

The Court, having considered the memoranda submitted, the files and records herein and, having heard the arguments of counsel, makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. At all material times herein, Gomes was the fee simple owner and lessor of that certain nonresidential, commercial real property and improvements located at 1334

Young Street, Honolulu, Hawaii ("Property"). Gomes leased the Property to Ja–Na of Hawaii, Inc. ("Ja–Na") pursuant to a lease dated April 24, 1974. The lease, as amended, was assigned to Gillis. The terms of the agreement between Gomes and Gillis with regard to the Property are set forth in the Lease dated April 24, 1974, First Amendment to Lease dated November 26, 1974, Assignment of Lease and Consent of Lessor dated June 1, 1978 and Letter Agreement dated July 10, 1981 (collectively referred to as the "Lease"). Gillis, in turn, subleased space in the Property to others, including Ja–Na.

2. In consideration of a $100,000.00 loan made to Gillis by the Bank on August 12, 1981, Gillis gave to the Bank a $100,000.00 promissory note, and an Assignment of Lessee's Interest in Lease and Consent, covering Gillis' interest in the commercial lease premises at the Property.

3. In consideration of an additional $25,-802.19 loan made to Gillis by the Bank on October 25, 1982, Gillis gave to the Bank a $25,802.19 additional promissory note, and an Additional Charge to Assignment covering Gillis' interest in the Property.

4. Although Gomes consented to these encumbrances, the consent expressly provided that none of Gomes' rights as lessor were waived and that all such rights under the Lease were reserved.

5. Gillis defaulted under the promissory note and additional promissory note to the Bank and, pursuant to the assignment of rents and the additional assignment of rents, on October 31, 1983, Gillis' tenants were instructed to pay their rents directly to the Bank instead of Gillis, with the Bank crediting Gillis' account.

6. The Bank would then pay to Gomes the monthly rent due from Gillis pursuant to the Lease. Each month the Bank issued a cashier's check for the lease rent payable to the order of Blake Okimoto, Gillis' attorney. Mr. Okimoto then endorsed the Bank's cashier check payable to the order of Allen W. Wooddell, Gomes' attorney.

7. The monthly rental was $9,360.00, including excise tax, plus property taxes which Gillis was also responsible for pay-ing as part of her rent obligation. By following the above-described procedure, the Bank paid Gomes the monthly rent, net of property taxes, through March 1985, when only a partial payment was made. Thereafter, the Bank stopped making Lease payments and Gomes received no further rent.

8. The Bank filed a foreclosure action against Gillis in the Circuit Court of the First Circuit, State of Hawaii, and on January 25, 1985 obtained a decree of foreclosure of the said Assignment of Lessee's Interest in Lease and Consent and the Additional Charge to Assignment.

9. On February 26, 1985, Gillis filed a voluntary petition for relief, and an order for relief was entered pursuant to Chapter 13 of the Bankruptcy Code. Gillis also caused her corporation, Ja–Na, to petition on the same date for voluntary reorganization under Chapter 11 of the Bankruptcy Code.

10. Upon the filing of Gillis' petition, the automatic stay provided for by 11 U.S. C. § 362 became effective. However, the Bank continued to receive post-petition rents from Gillis' subtenants. During the period from February 26, 1985 through June 12, 1985, the Bank claims it collected a net total of $37,598.79 in rents. However, pursuant to the partial accounting filed by the Bank with the Court on February 19, 1988, the Bank actually collected a net total of $39,847.00.

11. On June 12, 1985, the Court conducted a hearing on a Motion for an Order Confirming Rejection and Termination of Lease of Nonresidential Real Property filed by Gomes. At that hearing, the Court orally ruled that the Lease had been rejected and terminated by the operation of 11 U.S.C. § 365(d)(4) due to the Trustees' failure to assume the lease within 60 days from the order of relief, and ordered the Chapter 13 trustee to surrender possession of the property to Gomes. The Court's oral ruling was followed by a written Findings of Fact, Conclusions of Law and Order Granting Motion for Order Confirming Rejection and Termination of Lease of Non-

residential Real Property, filed August 7, 1985.

12. Motions to reconsider the Court's termination of the Lease were denied, and the Court's decision was affirmed by both the United States District Court for the District of Hawaii and the Ninth Circuit Bankruptcy Appellate Panel.

13. Pursuant to the Lease, for the period February 26, 1985 through June 12, 1985, the following amounts are due to Gomes as lessor:

| | | |
|---|---|---|
| March 1985 (net rent plus tax) | $ 5,440.74 | |
| April 1985 | 9,360.00 | |
| May 1985 | 9,360.00 | |
| June 1–12, 1985 | 3,692.76 | (307.73 per diem) |
| Property taxes | 3,049.50 | |
| Attorney's fees | 2,184.00 | |
| Total | $33,087.00 | |

The rent and other amounts set forth in the Lease, and the amounts set forth above, are reasonable and represent the reasonable value of the leased premises at 1334 Young Street for the relevant time period.

14. On June 20, 1985, the Bank filed a Motion for Instruction regarding the post-petition rents collected from Gillis' subtenants, then held in escrow by the Bank. This was followed by the filing of a related Motion for Interpleader on August 6, 1985. Although called a Motion for Interpleader, the Bank actually sought to keep all of the escrowed funds and use them to reduce Gillis' pre-petition debt.

15. The present case was converted first to proceedings under Chapter 11 of the Bankruptcy Code and, subsequently, to its present status under Chapter 7.

16. On September 2, 1987, Gomes filed his Application for Payment of Administrative Expense and Adjudication of Continued Motions.

17. After a hearing on October 28, 1987, this Court entered an Order Granting in Part Application for Payment of Administrative Expense and Adjudication of Continued Motions. Pursuant to that Order, the Court directed the Bank to turn over to the Chapter 7 trustee the sum of $37,-598.79, to be held by the trustee pending further court order. The Bank was also directed to file an accounting of all monies

received, pre-petition and post-petition, from Gillis, the Chapter 13 and Chapter 7 trustees and Ja–Na and its Chapter 7 trustee. The Court reserved for further action the issue of whether the Bank would be ordered to pay interest on the $37,598.79 turned over to the Gillis' Chapter 7 trustee. And the claim for administrative expense by Gomes was continued until moved on.

18. On February 19, 1988, the Bank filed accountings which indicated the following:

a. As of the date of the accounting, the Bank had been paid $118,638.62 from the bankruptcy estates of Gillis and Ja–Na and, after payment of all interest and late charges due and owing at the time of payment, a principal balance of $4,704.74 remained, which the Bank charged off on November 26, 1986, and

b. A net total of $39,874.00 in rents was collected post-petition and prior to the Court's ruling on June 12, 1985 terminating the Lease.

19. On March 15, 1988, Gomes renewed his Application for Payments originally filed on September 2, 1987 and which had been continued until moved on. Then, on April 13, 1988, the Trustee filed his Motion for Interest on Funds Previously Held by the Bank.

20. In his Application for Payment, Gomes has requested interest on the funds held by the Bank from the time the monies were collected until they were paid over to the trustee by order of this Court, on the theory that these funds were properly a part of the bankruptcy estate and should have been immediately paid over to Gillis or the trustee. Gomes contends that, because the Bank retained the funds, Gillis and the Trustee lost the opportunity to earn interest on the funds.

21. The Chapter 7 trustee has filed a memorandum supporting the position taken by Gomes, stating that the post-petition rents are a part of the Bankruptcy estate.

22. The Bank initially argued both in written memoranda and at prior hearings that Gomes had no right to an administra-

tive expense and that the Bank retained a post-petition security interest in the Lease. At the hearing held before this Court on July 15, 1988, the Bank reversed itself on both of these positions. Counsel for the Bank stated that the Bank had no argument with Gomes' claim to an administrative expense, and further acknowledged that the Bank's security interest was deemed fully extinguished as of the time Gillis filed her petition in bankruptcy on February 26, 1985. The Bank now takes the position that this Court is without jurisdiction to determine the disposition of the post-petition rents.

23. In addition, the Bank, in its memoranda filed with the Court, has accused Gomes and his counsel of acting in bad faith and taking positions before this Court which were frivolous and advanced in bad faith.

24. To the extent that these Findings of Fact constitute Conclusions of Law, they shall be so deemed.

## CONCLUSIONS OF LAW

■ 1. Gomes is entitled to payment of an administrative expense in the amount of $33,087.00. 11 U.S.C. §§ 365(d)(3) and 503(b)(1)(A). Section 365(d)(3) requires payment of full rent obligations until there is a decision to assume or reject a lease. *See e.g. In re Rare Coin Galleries of America, Inc.*, 72 B.R. 415, 416 (D.Mass.1987), *In re GHR Energy Corp.*, 41 B.R. 668 (Bkrtcy.D. Mass.1984); *Broadcast Corporation of Georgia v. Broadfoot*, 54 B.R. 606 (N.D. Ga.1985). Pursuant to Section 365(d)(3), Gomes is automatically entitled to all amounts due and owing under the Lease agreement for the 60–day period following the filing of Gillis' petition, without notice or hearing. *In re Coastal Dry Dock & Repair Corp.*, 62 B.R. 879 (Bkrtcy.E.D.N.Y.1986).

■ 2. During the holdover term beyond the 60–day period set forth in Section 365(d)(4), Gomes is entitled to recover the fair rental value of the leased property. Although courts have differed with respect to whether the administrative expense claim is to be based on the full rental value

or the debtor's actual use, this split in authority is inapposite in the present case since the debtor enjoyed the actual use and possession of the lease premises during the relevant time period.

■ 3. The lease agreement will establish the amounts owed by the debtor, absent convincing evidence to the contrary. *In re GHR Energy Corp.*, 41 B.R. at 672; *Broadcast Corp. of Georgia v. Broadfoot*, 54 B.R. at 613. This court has found as matter of fact that the rent and other charges set forth in the Lease are reasonable.

■ 4. The Lease was deemed rejected pursuant to 11 U.S.C. § 365(d)(4), and the effect of this rejection is to terminate the Lease. *In re Southwest Aircraft Services Inc.*, 66 B.R. 121 (9th Cir. BAP 1986), *rev'd on other grounds*, 831 F.2d 848. This termination is deemed effective as of the date the debtor filed her Bankruptcy petition. 11 U.S.C. § 365(g); *In re Lovitt*, 757 F.2d 1035 (9th Cir.1985); *In re Concrete Pipe Machinery Co.*, 28 B.R. 837 (Bkrtcy.N.D. Iowa 1983). The pre-petition effective date of the Lease termination does not affect Gomes' administrative claim. *In re National Oil Co.*, 80 B.R. 525, 527 (Bkrtcy.D. Colo.1987).

■ 5. The termination of the Lease pursuant to Section 365(d)(4) is absolute and, based upon the Supremacy Clause and the doctrine of federal preemption, cannot be affected or impaired by Hawaii state law. *See, In re Spats Restaurant & Saloon*, 64 B.R. 442, 447 (Bkrtcy.D.Nev.1986); *In re Southwest Aircraft Services*, 53 B.R. 805, 810 (Bkrtcy.C.D.Calif.1985).

■ 6. When the Lease was terminated, the Bank's security interest was completely extinguished, since there was no remaining leasehold interest to which the security interest could attach. The Bank cannot hold a security interest in property in which the debtor has no interest.

[A] mortgage ceases to have consequence as an interest in land whenever the mortgagor's interest in the premises ends, as where a mortgagor—leasee [sic]

surrenders the leased premises to his landlord.

3 *Powell on Real Property,* ¶ 461 (1987); see, *In re Bernard,* 69 B.R. 13, 14–15 (Bkrtcy.D.Haw.1986) (allowing leasehold mortgage to exist after rejection of lease would frustrate purpose of Section 365(d)(4)); *Anjo Restaurant Corp. v. Sunrise Hotel Corp.,* 414 N.Y.S.2d 265, 98 Misc.2d 597 (1979) (where leasehold is terminated, secured party with assignment of lease is precluded from asserting any right in leasehold). Upon the date that the Lease was effectively terminated, any right, title or interest held by the Bank in the Lease was fully and permanently extinguished.

■ 7. The central question before the Court is whether this Court has jurisdiction to dispose of the post-petition rents now held by the Chapter 7 trustee. The Court concludes that it has jurisdiction for the reasons set forth below.

8. The filing of Gillis' Chapter 13 petition automatically created an estate in bankruptcy. 11 U.S.C. § 541(a). Gillis' estate in bankruptcy included (a) all of her legal or equitable interests in property, wherever located and by whomever held, existing as of the commencement of the case, 11 U.S.C. § 541; and (b) all such property she acquired in the interim after the commencement of the case, but before the case is closed, dismissed or converted. 11 U.S.C. § 1306(a). Although Gillis no longer owned the property of the estate, 11 U.S.C. § 541(c), while she was in Chapter 13 and subsequently Chapter 11, she was entitled to remain in possession of such property, 11 U.S.C. § 1306(b). As the debtor in possession, Gillis is given control over the estate in order to pay current expenses and to formulate and implement a plan. *See generally, In re Lee,* 35 B.R. 452 (Bkrtcy.N.D.Ga.1983).

9. The rents paid by Gillis' subtenants, after the commencement of the case and collected by the Bank, are the property of the estate. *See e.g. In re Mallas Enterprises, Inc.,* 37 B.R. 964, 968 (9th Cir. BAP 1984).

10. A major area of dispute among the parties in this proceeding has been the impact of the decision in *In re Lovitt, supra.* This court is bound by decisions of the Ninth Circuit. However, this is true only insofar as the Circuit Court has rendered its decision based upon statutory or common law which has not been amended or altered. The court in *Lovitt* held that, because rejection of an executory contract is retroactive to the date the bankruptcy petition is filed, such a contract never became a part of the estate. 757 F.2d at 1041. But this particular aspect of the *Lovitt* decision cannot be treated as precedent in the present case since 11 U.S.C. § 541 provides that property of the estate includes all property in which debtor has an interest. Lovitt was decided under the former bankruptcy Act, which limited that which was considered property of the estate. The bankruptcy act has been substantially amended under the Code. This Court thus concludes that the lease was property of the estate for 60 days.

11. As this Court noted in its Findings of Fact, Conclusions of Law and Order Re Motion to Confirm Rejection and Termination of Lease dated March 13, 1986, in *In re Bernard,* Case No. 85–00427, a nonresidential real property lease is surrendered to the landlord pursuant to Section 365(d)(4), and not to the debtor as under the former Bankruptcy Act:

> Under this Section [365(d)(4)], the rationale of the earlier law, which provided that rejection had the effect of leaving the property with the debtor, is no longer applicable. Thus, the Court finds that *Lovitt* is not applicable to the instant case.

Id. at 19. This Court held in *In re Bernard* that the reasoning of *Lovitt,* which was based upon Section 70(b) of the Bankruptcy Act, was inapplicable under the Code and ruled that the rejection of a lease under Section 365(d)(4) resulted in its termination rather than abandonment. *See, In re Re–Trac,* 59 B.R. 251, 257 (Bkrtcy.D. Minn.1986) (noting absence of provision in Section 70(b) of Bankruptcy Act directing surrender of premises to lessor).

12. The grounds previously set forth by this Court for distinguishing *Lovitt* from cases decided under Section 365(d)(4) apply with equal force to the question of whether this Court retains jurisdiction to decide issues relating to the Lease after the effective date of its rejection. Under the Bankruptcy Code, as opposed to the prior Act, a lease becomes a part of the bankruptcy estate at the time of filing, and need not be expressly assumed by the trustee. 11 U.S.C. § 541. This is a critical distinction which is highlighted by the *Lovitt* court's holding that, under the Bankruptcy Act, leases do not automatically vest in the trustee, but "vest only upon the trustee's timely and affirmative act of assumption". 757 F.2d at 1041 [citations omitted]. Under the Bankruptcy Code, property automatically becomes a part of the bankruptcy estate, until it is abandoned, rejected, resold, exempted or otherwise disposed of. As previously noted, the Lease and post-petition rents became a part of Gillis' estate, as profits from property of the estate. 11 U.S.C. §§ 541 and 1306.

13. The Bank argues that this Court has been divested of its jurisdiction over the post-petition rents, not only because of the holding in *Lovitt*, but by purportedly similar holdings in several later cases. *In re Crystal Manufacturing & Packaging, Inc.*, 60 B.R. 816 (N.D.Ill., E.D.1986); *In re Las Margaritas*, 54 B.R. 98 (Bkrtcy.D. Nev.1985); *In re Spats Restaurant & Saloon, supra; In re Chandel Enterprises, Inc.*, 64 B.R. 607 (Bkrtcy.C.D.Calif.1986). These cases stand for the proposition that, once a lease has been deemed rejected by operation of law, the court does not have jurisdiction to resurrect any of the debtor's rights in the lease, including the right of the debtor or the bankruptcy trustee to negotiate a sale of the lease under the auspices of the bankruptcy court. The Court does not dispute this, but it has no bearing on the present case. There is no attempt by Gomes or the court to resurrect or transfer any interest of the debtor in a lease now rejected and terminated, nor is this court's jurisdiction contingent on any present interest of Gillis in the Lease or subleases. The subject matter of the present dispute is not an interest in the Lease or subleases themselves, but rents which were collected *prior* to the order terminating the Lease, during a period in which the estate had a clear entitlement to those rents. These monies were and remain a part of the bankruptcy estate, and are therefore squarely within this court's jurisdiction.

14. As stated in *Crystal Manufacturing*, 60 B.R. at 818, a bankruptcy court lacks jurisdiction where a controversy is exclusively between third parties and does not involve, "directly or indirectly, the bankrupt or its property", and has no jurisdiction where a dispute "does not involve property in which the bankrupt's estate asserts an interest". This is not the case here. In the present case, the subject matter of the dispute involves the debtor and her property, *i.e.*, the post-petition rents. Moreover, the Chapter 7 trustee has stated that the subject funds are part of Gillis' estate, making them "property in which the bankrupt's estate asserts an interest." Id.; Memorandum of Edwin J. Kelly, Trustee filed July 6, 1988.

15. In *In re Chandel Enterprises Inc.*, 64 B.R. 607 (Bkrtcy.C.D.Cal.1986), a nonresidential lease was rejected pursuant to Section 365(d)(4). Rents were paid to the lessor after 60 days had passed from the date the petition was filed. The court held that, although the lessor was entitled to bring a motion for payment of an administrative expense for rents due and owing beyond the 60–day period, the debtor was entitled to bring an action seeking turnover of the lease rents paid to the lessor outside this period. Thus, the Court retained jurisdiction over these issues despite the rejection and termination of the lease. This is precisely the situation now before this Court.

16. The effective termination of Gillis' rights in the Lease as of the date of the filing of her petition does not divest the bankruptcy estate of Gillis' interest in the post-petition rents. Although the termination of the Lease is treated as a pre-petition event, this is only for the purpose of

determining the rights of certain creditors. 11 U.S.C. §§ 365(g) and 502(g). The legislative history of Section 365(g) states that its "... purpose is to treat rejection claims as pre-petition claims." House Report No. 95–595, 95th Cong., 1st Sess. 349 (1977); Senate Report No. 95–989, 95th Cong., 2d Sess. 60 (1978), U.S.Code Cong. & Admin. News, 5787. Its effect is therefore limited to determining the nature of certain creditors' claims. Thus, for example, the Bank is regarded as a general unsecured creditor since its security interest is deemed to have evaporated at the time Gillis filed her bankruptcy petition. `For jurisdictional purposes and for the purposes of determining whether the post-petition rents are a part of Gillis' estate, Sections 365(g) and 502(g) have no effect.

17. The Lease and subleases remained a part of the estate until terminated 60 days after the order of relief, after which they were automatically rejected because they were not assumed. While the termination of Gillis' property interest in the Lease and subleases were confirmed by this Court's ruling on June 12, 1985, that ruling did not affect the estate's interest in the rents which had already been paid pursuant to the Lease and subleases that were valid and enforceable at the time the rent payments were made, and which were paid within 60 days after the order for relief.

18. At oral argument on July 15, 1988, the Bank for the first time argued that Gillis could not have enforced the Lease or subleases as of the filing date because of the retroactive effect of the court's order regarding termination. Thus, the Bank argues that the lease rents could not become a part of the bankruptcy estate. This contention has no merit. Section 365(d)(4) allows a debtor sixty days to assume or reject a non-residential lease. *National Oil Co.*, 80 B.R. at 526. Nowhere in the bankruptcy code is there a provision prohibiting the debtor from enforcing his rights under a lease against third parties during this 60–day period prior to rejection. In fact, in the instant case, the debtor and the trustee would be remiss in their obligation to consolidate and maximize the assets of the estate if they fail to collect monies due and owing to the debtor pursuant to a valid lease agreement. The Lease and subleases became a part of the estate at the time Gillis filed her petition and remained valid and enforceable by the estate until the court confirmed their rejection and termination.

19. Section 365(g) deems this termination to have occurred at the time of filing and, while this impacts the rights of creditors such as the Bank, it does not affect the rights held by the debtor and her estate during the interim period between the filing of her petition and the order rejecting the Lease.

20. The fact that post-petition rents were improperly collected by the Bank does not change the character of these funds. Although the Bank previously claimed a security interest in the sublease rents, it was not entitled to unilaterally appropriate these monies. The automatic stay provisions of Section 362 forbid such action, and the Bank was required to move for relief from the stay or await final disposition of the estate. *McLemore v. Citizens Bank of Cookeville (In re Tom McCormick Enterprises, Inc.)*, 26 B.R. 437, 441 (Bkrtcy.M.D.Tenn.1983).

21. Even if the Bank had collected the rents solely for the purpose of freezing these funds or withholding them subject to a setoff, the Bank should have promptly filed a motion seeking relief from the automatic stay in order to avoid violating the stay. *See, Kenney's Franchise Corp. v. Central Fidelity Bank N.A., Lynchburg*, 22 B.R. 747, 748–49 (W.D.Va.1982); *In re Carpenter*, 14 B.R. 405, 407 (Bkrtcy.M.D. Tenn.1981); *See, also, Miller v. Savings Bank of Baltimore*, 22 B.R. 479 (D.Md. 1982) (onus should not be on debtor to take affirmative legal steps to recover property seized in violation of automatic stay). If the Bank claimed an entitlement to the rents, it should have had them paid to the trustee and asked the trustee to segregate them pending an action to set aside the automatic stay, or it should have immediately filed a motion for relief from the

automatic stay. *See, In re Engstrom,* 33 B.R. 369 (Bkrtcy.D.S.D.1983).

22. Other courts have retained jurisdiction to hear executory contract-related issues after their rejection. *In re Chandel, supra,* (court would retain jurisdiction to hear debtor's motion to recover rents improperly paid to lessor under lease deemed rejected); *cf., In re Continental Airlines Corp.,* 64 B.R. 858 (Bkrtcy.S.D.Tex.1986) (court retained jurisdiction to determine contract claim after rejection of executory contract by debtor). The fact that § 365(d)(4) directs the trustee to immediately surrender the nonresidential real property to the lessor (rather than to the debtor) also evidences the bankruptcy court's continuing jurisdiction over leasehold issues. *See, In re O.P. Held, Inc.,* 77 B.R. 388 (Bkrtcy.N.D.N.Y.1987) (clear language of Section 365(d)(4) empowers court to order immediate surrender, rather than relegate to state court eviction action); *but see, In re Adams,* 65 B.R. 646 (Bkrtcy.E.D.Pa. 1986).

23. A related jurisdictional issue is whether the court has jurisdiction only over post-petition rents collected during the 60–day period provided for in Section 365(d)(4), or all rents collected prior to the court's ruling on June 12, 1985. Section 365(d)(4) provides that the debtor's interest automatically terminates after 60 days upon failure to either assume or reject a nonresidential lease, although the lease will not actually be rejected until the Court has acted. *National Oil Company,* 80 B.R. at 526, ("The plain, unequivocal language of Section 365(a) indicates that court approval is required before a lease can be rejected."), citing, *inter alia, In re Treat Fitness Center, Inc.,* 60 B.R. 878 (9th Cir. BAP 1986).

24. Accordingly, this Court has jurisdiction only over the post-petition rents collected in the 60 days after this order of relief was entered. Beyond that time, the debtor no longer had any interest in the Lease or leased premises. *See, Chandel,* 64 B.R. at 10 (after automatic rejection, court without jurisdiction to resurrect debtor's property rights). The balance of these funds should be paid over to the Commis-

sioner appointed in the state court foreclosure proceedings, or to the registry of the First Circuit Court, State of Hawaii. Gomes and the Bank may proceed in state court to determine the rights as to rents collected after the 60 days from the date of relief.

25. Although the Bank claims that its right to the post-petition rents "vested" upon filing of the state court's interlocutory decree of foreclosure, this claim is inaccurate. By the express terms of the subject state court order, the Bank is only entitled to any funds remaining after the rents due to Gomes have been paid. That order states:

> [W]ith respect to vacancies and delinquent tenants of the commercial premises (including tenants Defendant GILLIS and JA–NA) the commissioner shall take possession of such premises and take measures necessary to collect the fair market rents for such premises, including advertising the said premises and prosecuting eviction proceedings as may be necessary, and shall pay any proceeds therefrom first to ground lease rents and the balance, if any, to any delinquencies due Plaintiff (Bank) under the first and second promissory notes.... (emphasis added)

*Hawaii National Bank, Honolulu v. Shugei Nalei Gillis, et al.,* First Circuit Court, State of Hawaii, Civil No. 84–0023, Findings of Fact, Conclusions of Law and Order Granting Motion for Summary Judgment and Interlocutory Decree of Foreclosure filed January 25, 1985.

26. Even if the Bank claimed a right to the sublease rents through an interest in the Lease, it acquired no "vested" interest which deprived Gillis of her rights under the Lease or sublease agreements. Simply obtaining a decree of foreclosure does not divest the debtor of her legal or equitable interest in a lease. *In re Park Timbers, Inc.,* 58 B.R. 647, 649–50 (Bkrtcy.D.Del. 1985) (debtor retained legal and equitable rights which would not be extinguished until foreclosure sale was actually consummated.) *See also In re Kealia Beach Village, Inc.,* 18 B.R. 133 (Hawaii 1982). This

Court recognized that principal when it ordered the Bank to turn over the post-petition rents to the trustee.

27. Gomes is entitled to immediate payment of his administrative expense claim in full, notwithstanding other administrative expense claims. *In re Rare Coin Galleries of America, Inc.*, 72 B.R. 415 (D.Mass.1987) (Section 365(d)(3) gives "special administrative claim priority" to post-petition rent claims, even where there are insufficient funds to pay all other priority claimants); *Matter of Longua*, 58 B.R. 503 (Bkrtcy.W.D.Wis.1986); *Contra, In re Dieckhaus Stationers of King of Prussia Inc.*, 73 B.R. 969 (Bkrtcy.E.D.Pa.1987) (claim pursuant to Section 365(d)(3) does not constitute superpriority).

28. As the court stated in *Rare Coin Galleries*, Section 365(d)(3) mandates "timely" payment of the "full rent obligation" until a nonresidential lease is assumed or rejected. In addition, the court in *Rare Coin Galleries* required the immediate payment of the rents due and owing for the holdover period after expiration of the 60-day period, stating:

The trustee's failure to comply with his mandate should not result in a rent obligation less burdensome than when the trustee was properly on the premises during the sixty-day post-petition period.

72 B.R. at 417. This court agrees with the reasoning of the district court in *Rare Coin Galleries*.

29. The legislative history of §§ 365(d)(3) and (4) specifically singles out the nonresidential lessor as deserving of special treatment.

A second and related problem is that during the time the debtor has vacated space but has not yet decided whether to assume or reject the lease, the trustee has stopped making payments due under the lease. Lease payments include rent due the landlord and common charges which are paid by all the tenants according to the amount of space they lease. In this situation, the landlord is forced to provide current services—the use of its property, utilities, security, and other services—without current payment. *No*

*other creditor is put in this position ...*

(emphasis added) 130 Cong.Rec. S8894–95 (daily ed. June 29, 1984), cited in *National Oil*, 80 B.R. at 527. While the Bankruptcy Code does not provide a specific remedy for the trustee's failure to comply with the provisions of Section 365(d)(3), this legislative history distinguishes the nonresidential lessor from all other creditors. Recognizing this special treatment, other courts have held that a claim under § 365(d)(3) does not require notice or hearing as would an ordinary administrative expense claim pursuant to Section 503(b)(1)(A). *In re Coastal Dry Dock & Repair Corp.*, 62 B.R. 879 (Bkrtcy.E.D.N.Y.1986); *Matter of Longua*, 58 B.R. at 505.

30. It is clear that the Bank's retention of post-petition rental income collected from Gillis' subtenants to reduce Gillis' pre-petition indebtedness to the Bank violates the automatic stay. *In McLemore v. Citizens Bank of Cookeville (In re Tom McCormick Enterprises, Inc.)*, 26 B.R. 437 (Bankr.M.D.Tenn.1983), the Court notes

The court recognizes that the bank claims a security interest in the proceeds of its collateral deposited to the account. Nonetheless, the bank is not entitled to unilaterally appropriate the proceeds to partially satisfy its pre-petition debt. The automatic stay provisions of 11 U.S.C.A. § 362 (West 1979) preclude such action. The bank must either apply for permission to move against the collateral or await final disposition of the estate.

*Id.* at 441 (footnotes omitted).

32. Even if the Bank merely retained the subtenants' rents and did not apply such monies to reduce Gillis' pre-petition indebtedness, such retention is likewise violative of the automatic stay. If a bank "freezes" or withholds funds subject to a valid setoff, the bank must promptly file a complaint seeking relief from the automatic stay in order to avoid violating the stay. *See Kenney's Franchise Corp. v. Central Fidelity Bank N.A., Lynchburg*, 22 B.R. 747, 748–49 (W.D.Va.1982) (Chapter 11 case); *Third National Bank in Nashville v. Carpenter (In re Carpen-*

*ter* ), 14 B.R. 405, 407 (Bankr.M.D.Tenn. 1981).

33. It was incumbent upon the Bank to take swift and sure action to ensure that the subtenants' rents it had collected were made available to Gillis to keep her master lease current for the preservation of the estate, as well as for the protection of the Bank's own collateral security interest therein. As recognized in *Miller v. Savings Bank of Baltimore*, 22 B.R. 479 (D.Md.1982),

> The courts have been quick to realize that creditor inaction can often be as disruptive to the debtor as affirmative collection efforts.... To place the onus on the debtor, as the Bank would have the Court do, to take affirmative legal steps to recover property seized in violation of the stay would subject the debtor to the financial pressures the automatic stay was designed to temporarily abate, and the contemplated breathing spell from his creditors illusory....

*Id.* at 481 (citations omitted.) *Compare In re Lee*, 35 B.R. 452, 458 (Bankr.N.D.Ga. 1983) ("When the Bank eliminated the [Chapter 13] debtors access to their current funds, the Bank precipitated an unexpected financial emergency.").

34. Because the Bank improperly accepted and retained the post-petition rents in violation of the automatic stay and failed to seek relief from the stay, the Bank is liable to Gillis for interest on the sums withheld. *See, Miller v. Savings Bank of Baltimore, supra.* The rate of interest paid shall be the amount of interest that the Bank paid on customer passbook accounts for the applicable period. Interest shall be due and payable on the amounts collected during the 60–day period from the date of collection through the date upon which the monies were paid over to the Chapter 7 trustee.

35. Gomes has incurred additional attorneys' fees and costs since the filing of the Application and is entitled to recover such fees and costs, as the court deems reasonable and they shall be paid to Gomes in addition to the amount prayed for in Gomes' Application.

## ORDER

IT IS HEREBY ORDERED:

1. The Application for Payment of Administrative Expense and Adjudication of Continued Motions is hereby granted in part.

2. The Motion for Instruction and Motion for Interpleader filed by the Bank on June 20, 1985 and August 6, 1985, respectively, are hereby denied insofar as they seek to allow the Bank to retain the post-petition rents. The disposition of the post-petition rents shall be in accordance with the terms of this order as set forth below.

3. The Chapter 7 trustee shall be entitled to all of the rents collected from the subtenants within the 60–day period after the order for relief and he shall pay to Gomes the amount of lease rents accrued during those same 60 days as a priority administrative expense, to the extent that funds are available. The Trustee shall turn over to the state court foreclosure commissioner any rents collected after the 60 days from the order of relief had expired.

5. Gomes shall submit an application for additional attorneys' fees and costs to be awarded as a further priority administrative expense.

6. The Bank shall pay to the Chapter 7 trustee a sum equal to interest on the principal sum of the amounts collected in the 60–day period after the order of relief at the rate of interest paid to its customers from the date of collection through the date the post-petition rents held by the Bank were paid to the Chapter 7 trustee.

7. The remaining assets of the bankruptcy estate shall be held by the Chapter 7 trustee pending further order of this Court.