### In re RAYMOND COSSETTE TRUCKING, INC., Debtor.

### Bankruptcy No. 97–31347.

United States Bankruptcy Court, D. North Dakota, Northwestern Division.

Feb. 23, 1999.

Kip Kaler, Fargo, North Dakota, trustee.

Jon Brakke, Fargo, North Dakota, for General Electric.

David Johnson, Fargo, North Dakota, for debtor.

### ORDER

WILLIAM A. HILL, Bankruptcy Judge.

This matter is before the Court on the Trustee's objection to the Administrative Expense Claim filed by General Electric Capital Corporation filed on September 15, 1998. In its request General Electric has asserted a claim in the total amount of $282,608.72 aris- ing from the continued use by Cossette Trucking as debtor-in-possession of leased and financed refrigerated trailers from Chapter 11 case inception to the date of its conversion to Chapter 7.[1] The Trustee has raised manifold objections arguing that General Electric's claim should be completely denied. A hearing was held on January 27, 1999.

*The Facts*

**1.**

Based in Fargo, North Dakota, Cossette Trucking was a regional operator of temperature controlled fast food transportation. Its business was carried out by means of over-the-road refrigerated trailers. On January 20, 1995, Cossette Trucking executed a Master Equipment Lease with ITT Commercial Finance Corp. for the leasing of ten (10) 1995 Utility 53' × 102" refrigerated trailers equipped with Carrier cooling units pursuant to which they agreed to pay $9,666.56 per month over sixty months. General Electric is the successor lessor under this lease. On December 29, 1994, Cossette Trucking purchased, as a part of a single transaction, thirty-four 1989 Great Dane 53' × 102" refrigerated trailers, twenty-four 1988 Great Dane 53' × 102" refrigerated trailers, and fifteen 1990 Great Dane 53' × 102" refrigerated trailers, all with Carrier cooling units. This purchase was financed with ITT Commercial Finance Corporation and subsequently taken over by General Electric. According to the terms of the various loan documents, Cossette Trucking agreed to make monthly payments of $29,403.77 commencing February 1, 1995, and continuing for thirty-six months, maturing on January 1, 1998. Unfortunate economic reversals caused Cossette Trucking to file for relief under Chapter 11 on September 9, 1997. Hoping to see a reversal of its financial situation, the company continued in operation and continued to possess and use the subject trailers in its operation.

---

1. The proof of claim sets forth a claim of $238,-630.51 but counsel for General Electric both in his response to the Trustee's objection and at the hearing calculated the claim to be $282,608.72.

Both parties refer to this latter amount in their briefs and have stipulated that $282,608.72 is the correct amount of the claim.

On February 17, 1998, General Electric filed a motion seeking immediate assumption or rejection of the leased equipment and relief from stay as to both leased and financed units. Negotiations resulted in a stipulated settlement of the motion under which Cossette Trucking, as debtor-in-possession, rejected the lease and agreed to deliver all leased equipment to General Electric by April 13, 1998. Failure to do so would result in automatic lifting of the stay. As for the financed units, Cossette Trucking assented to relief from stay and agreed to deliver these units as well to General Electric by April 13, 1998. Cossette Trucking agreed that it would use its best efforts to deliver the equipment to such locations as General Electric might direct. The stipulation specifically reserved to General Electric the right to assert an Administrative Claim. The terms of the stipulation were approved by Order entered April 8, 1998. The equipment, however, was not returned by the stipulated date and on April 16, 1998, the case was converted to a Chapter 7. Immediately, the Trustee sought the rejection and abandonment of all leased and financed trailers.

### 2.

As both the leased and financed trailers were used throughout the Chapter 11 by Cossette Trucking as debtor-in-possession, General Electric asserts it is entitled to an Administrative Claim for the value of the trailers to the estate from September 9, 1997, to the conversion date of April 16, 1998, with the appropriate measure of value being the monthly rental payment of $9,666.56 for leased equipment and the monthly finance payment of $29,403.77 for the financed equipment. As thus calculated, the Administrative Expense Claim for leased units is $69,921.45 (pro-rated for the partial months of September 1997 and April 1998), and $212,687.27 for the financed units (pro-rated for the months of September 1997 and April 1998). General Electric's Administrative Claim is wholly premised upon section 503(b)(1)(A) of the Bankruptcy Code with the focus being upon the actual and necessary costs of providing benefit to the Chapter 11 estate. No evidence bearing on the question of reasonable rental value was produced, it being General Electric's position that both the monthly

lease payment and monthly finance payments as provided for in the respective documents are presumptively correct reflections of the value of the trailers to the estate for the period in question. The Trustee does not believe section 503(b) has any applicability at all in the case of the leased equipment, arguing that under section 365(b)(10), General Electric's remedy, short of achieving possession, is an unsecured claim for damages in consequence of breach. As for the financed equipment, the Trustee believes General Electric should be estopped from seeking an Administrative Claim because it made no effort early on in the Chapter 11 case to recover the equipment through relief from stay or otherwise seek adequate protection of its interest until five months had passed. Moreover, even assuming an administrative claim may exist, the Trustee argues that the amounts claimed by General Electric bear no relationship to what is the reasonable, actual, and necessary costs of preserving the estate.

### Discussion

### 1.

■ The starting point of discussion is section 503(b)(1)(A) of the Bankruptcy Code which grants administrative expense status to the, "actual, necessary costs and expenses of preserving the estate." The party asserting the status of an administrative claimant bears the burden of proving that:

(1) the claim arose from a transaction with or on account of consideration furnished to the debtor-in-possession, and

(2) the transaction or consideration directly benefited the debtor-in-possession. *In re Mid Region Petroleum, Inc.*, 1 F.3d 1130, 1133 (10th Cir.1993); *In re Patient Educ. Media, Inc.*, 221 B.R. 97 (Bankr.S.D.N.Y. 1998).

Before testing General Electric's claim against the section 503 criteria, it is well to first address the Trustee's contention that an administrative expense claim is not among the remedies available to lessors who have their leases rejected. Section 365(b)(10), as relevant, provides as follows:

The trustee shall timely perform all of the obligations of the debtor, ... first arising

from or after 60 days after the order for relief in a case under chapter 11 of this title under an unexpired lease of personal property . . . until such lease is assumed or rejected notwithstanding section 503(b)(1) of this title . . .

Section 365(d)(1), as relevant, provides as follows:

. . . [I]f the trustee does not assume or reject an executory contract or unexpired lease of . . . personal property of the debtor within 60 days after the order for relief, or within such additional time as the court, for cause, within such 60–day period fixes, then such contract or lease is deemed rejected.

Section 365(g), as relevant, provides:

. . . [T]he rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease . . .

Although section 365(d)(10) places an affirmative duty of performance upon the lessee during the 60–day period immediately following petition filing, this section, as well as section 365(d)(1), is silent as to what remedy the lessor has should the lessee not perform and unilaterally reject the lease by affirmative action or by default. The Trustee, pointing to section 365(g), argues that the only remedy plainly provided for within section 365 is to seek status as a general unsecured creditor with a claim for damages arising out of breach of contract. The Trustee further argues that a lessor who feels its property is at risk while in possession of the debtor-in-possession has an affirmative duty to invoke other Bankruptcy Code remedies to protect its rights such as seeking relief from stay. What a lessor should not be able to do, and what the Trustee believes is the situation here, is to sit back and do nothing hoping that the period during which the debtor-in-possession retains the property can later form the basis for an administrative expense claim. Similarly, with respect to financed collateral remaining in the debtor-in-possession's possession, the Trustee charges that the secured creditor must early in the case advance its claim for relief from stay or adequate protection of its interest as opposed to merely idly sitting back hoping to recoup

the defaulted payments by means of an administrative expense claim.

 The referenced provisions of section 365 regarding lease rejection and breach and section 503(b)(1)(A) providing for an administrative expense claim are, in this Court's opinion, mutually exclusive of each other. Typically, a rejection of a pre-petition contract or lease will result in a breach as of petition filing and give rise to nothing more than an unsecured claim for damages *assuming the debtor-in-possession has not used the property to its benefit.* 4, *Collier's on Bankruptcy,* ¶ 503.06 (rev. 15th ed.1998). If, however, the debtor-in-possession does more with the property than merely retain possession and garners benefit from that retention, then section 503(b)(1)(A) comes into play irrespective of whether damages for breach might otherwise lie. *See generally In re Thompson,* 788 F.2d 560 (9th Cir.1986); *Kinnan & Kinnan Partnership v. Agristor Leasing,* 116 B.R. 162 (D.Neb.1990).

 Section 365(d)(10) is patterned after section 365(d)(2), a section which most courts, contrary to the Trustee's view, interpret as abrogating the requirements of section 503(b)(1) with the lessor automatically becoming entitled to an administrative expense claim for all sums coming due under the lease during the 60–day hold-over period. *E.g., In re Gillis,* 92 B.R. 461 (Bankr.Hawai'i 1988); Elizabeth Lea Black, Annotation, *What are "Administrative Expenses" Under § 503(b) of Bankruptcy Code Granted First Priority for Payment Pursuant to § 507(a)(1) of Code,* 140 ALR Fed. 1 (1998). Following the 60–day hold-over period and upon rejection, the lessor is left with nothing more than an unsecured claim for breach *unless* it can establish an independent claim for administrative expenses under section 503(b)(1)(A). The Trustee's suggestion that the spurned lessor or secured creditor must take steps to protect its property is an argument that works on the opposite side of the coin as well. There is a line of cases holding to the view that a lessor or secured creditor has an affirmative responsibility to monitor its property and cannot sleep on its rights. *E.g., In re Carmichael,* 109 B.R. 849 (Bankr. N.D.Ill.1990). Most courts, however, do not

construe this obligation as grounds for an estoppel argument. *See Matter of JAS Enterprises, Inc.,* 180 B.R. 210 (Bankr.Neb. 1995). The lessor/secured creditor and the debtor-in-possession have correlative responsibilities regarding the property and their respective rights in it. While, as the Trustee argues, the lessor or secured finance creditor have a duty to recover property not in use and thereby reduce the property's exposure to risk, by the same token, the debtor-in-possession has a duty to protect the property and see that it is promptly returned to the creditor in order to limit any eventual administrative expense claim. These duties have nothing to do with whether the lessor or secured creditor might have cognizable claims for administrative expenses. That question is addressed wholly within the context of section 503(b)(1)(A) without regard to what a lessor or debtor-in-possession should have or should not have done. To follow the Trustee's reasoning would, in many cases, give a debtor-in-possession complete license to use property in its possession without any restraint and without any expectation that it would later have to compensate someone for that use. This does not make any sense to the Court. The issue as regards administrative expenses is quite simply whether the property continued to be used by the debtor-in-possession and what the value of that use was to the Chapter 11 estate.

2.

■ If property in possession continues to be used whether that use arises out of a lease or financed arrangement, the debtor-in-possession is liable for what the value of that use was to it. Case law has developed along two lines in arriving at a method of placing a dollar value on the continued use. One holds that the section 503 claim must be based upon the reasonable rental value of the property without regard to the debtor-in-possession's actual use. *E.g., In re Fred Sanders, Co.,* 22 B.R. 902 (Bankr.E.D.Mich.1982). The other says the claim must be based upon the debtor-in-possession's actual use as section 503(b)(1)(A) focuses upon "necessity" of the expenses. *E.g., In re Intran Corp.,* 62 B.R. 435 (Bankr.Minn.1986). A better view in light of the language of section 503(b)(1)(A) is to use an objective worth standard that measures the fair and reasonable value of the property to the debtor. As for leased property, most courts take the position that the rent specified in the lease itself is the presumed reasonable value of the property to the debtor-in-possession. *In re Thompson, supra; In re Patient Educ. Media, Inc., supra; In re Gillis, supra; JAS Enterprises, supra; Matter of Thayn Farms, Inc.,* 117 B.R. 510 (Bankr.Neb.1988). This presumption is rebuttable and either party may offer evidence to prove a different reasonable value. *In re Dant & Russell, Inc.,* 853 F.2d 700, 707 (9th Cir.1988); *In re Thompson, supra. See generally* 4, *Collier's on Bankruptcy,* ¶ 503.06[6][c][ii] (rev. 15th ed.1998).

■ In the case at bar, there is no dispute over the fact that Cossette Trucking, as debtor-in-possession, continued to use the ten leased trailers and the 73 financed trailers throughout the duration of its Chapter 11. General Electric argues in the case of the leased units, that the monthly lease payment of $9,666.56 should be presumed to be the reasonable value of their use to the debtor-in-possession. The Court agrees. No evidence to the contrary was produced to overcome this presumption.

■ As for the 73 financed trailers, General Electric says the debtor-in-possession got a good deal in using them in its operation at a monthly cost of $29,403.77. Beyond its argument that General Electric should have taken steps to repossess these units, the Trustee asserts that the post-petition loan payments bear no relationship to the value the 73 units had to the Chapter 11 estate. Aside from the financing documents and the Trustee's agreement as to the amount of post-petition payments in default, there is no other evidence one way or the other bearing on the issue of value of the 73 financed units to the estate. The monthly lease charge set forth in a lease is presumptively representative of the reasonable rental value of the property for the simple reason that in a true lease the lessee pays only for the usage. Ownership of the property along with its residual value remains with the lessor. Thus, the lease amount is not representative

of the total market value of the property but only of its usage. In a financed arrangement, the price is the total value with the purchaser becoming owner of the property at the end of the term, assuming all payments have been made. Up to that point, however, and throughout the payment term, the purchaser is only incrementally gaining an equity position. Depending upon the principal amount advanced and the term over which payments are made, those payments may or may not be closely representative of what a lease rate would be for similar equipment over a similar term. In the case at bar, the assessment is not made in isolation but can be made using the monthly lease rate for the ten leased units as a gauge. The financed units are basically the same in characteristic to the ten leased units. The leased units were 1995 53′ × 103″ Utility trailers with Carrier cooling units. The 73 financed units were several years older and of a different manufacture, but were the same size and had the same cooling units. General Electric argues that presumably the monthly finance charge of $29,403.77 for the 73 units is a fair computation of reasonable value. On a per-trailer basis, the leased units went for $966.00 per month—an amount the Court believes is presumptively reflective of reasonable value to the estate. By the same token, the 73 units cost $403.00 per unit per month—an amount which is less than half of what the presumptively reasonable value of the leased units was. Taking the age factor into account, the Court believes, in the absence of evidence to the contrary, that the monthly finance payment of $29,403.77 is a fair reflection of what the value of the 73 trailers was to the Chapter 11 estate.

Accordingly, and in consideration of the foregoing discussion, General Electric Capital Corporation is allowed an Administrative Expense Claim in the total sum of $282,-608.72 consistent with the unpaid post-petition monthly rental payments on leased trailers and the unpaid post-petition loan payments on the financed trailers.

**SO ORDERED.**