In re Paul T. LOCKE; Elfrieda
H. Locke, Debtors.

CASC CORPORATION, Plaintiff,

v.

Reese L. MILNER II, as Successor Trustee of the Milner Family Trust, dated November 2, 1973; Daniel M. Gottlieb; Steven D. Lebowitz; G & L Development; Paul T. Locke; Elfrieda H. Locke; Carolyn A. Dye, Chapter 7 Trustee, Defendants.

Bankruptcy No. LA 93–26758–VZ.
Adv. No. LA 94–02771–VZ.

United States Bankruptcy Court,
C.D. California.

March 29, 1995.

Kenneth N. Russak, Los Angeles, CA.

Edmund S. Schaffer, Los Angeles, CA.

## OPINION REGARDING THE EFFECT OF REJECTION ON UNEXPIRED NON–RESIDENTIAL LEASE AND UPON EXECUTORY CONTRACT

VINCENT P. ZURZOLO, Bankruptcy Judge.

### I. INTRODUCTION

CASC Corporation ("Plaintiff" or "Judgment Creditor") is the plaintiff in this adversary proceeding and Reese L. Milner II, as successor trustee of the Milner Family Trust (the "Non–Debtor Co–Tenant"), Daniel M. Gottlieb ("Gottlieb"), Steven D. Lebowitz ("Lebowitz"), and G & L Development the ("Management Entity") (collectively the "Co–Tenant Defendants") are defendants in this adversary proceeding. Other defendants include Paul T. Locke and Elfrieda H. Locke (the "Lockes"), the debtors in this chapter 7 bankruptcy case, and Carolyn A. Dye (the "Trustee"), the trustee in this chapter 7 bankruptcy case.

Plaintiff and the Co–Tenant Defendants have filed cross-motions for summary judg-ment (the "Motions").[1] In the Motions, the Plaintiff and the Co–Tenant Defendants request that I declare their respective rights and interests in an unexpired ground lease of non-residential property (the "Lease") and a tenancy in common agreement (the "Tenancy Agreement") that pertains to the Lease. The specific issue is what impact the deemed rejection of the Lease and the Tenancy Agreement, pursuant to 11 U.S.C. § 365(d), has on the interest that the Judgment Creditor asserts in the monies that accrue under the Tenancy Agreement.

To resolve this issue I must first decide whether the Tenancy Agreement is an executory contract and, if it is, whether the deemed rejection of the Lease and the Tenancy Agreement terminates and extinguishes not only the Lease and Tenancy Agreement but also the Judgment Creditor's lien interests in the Lease and the Tenancy Agreement.

The relevant facts underlying this dispute are not contested and are recounted below.

### II. FACTS

D & G is a California general partnership that became a lessee under a ground lease for property located on Bedford Avenue in Beverly Hills, California (the "Bedford Property"). D & G developed and built an office building on the Bedford Property and subleased it to tenants (the "Subleases") who occupied the building. The Subleases generate a significant amount of income in excess of the payments due under the Lease and the other obligations incurred in managing the Bedford Property. Pursuant to negotiations and consideration irrelevant to this dispute, D & G transferred 99% of its interest in the Lease to the Non–Debtor Co–Tenant and retained 1% of the interest in the Lease for itself. D & G and the Non–Debtor Co–Tenant also entered into the Tenancy Agreement with regard to the Lease and the Bedford Property. Approximately at the same time, the Lockes, who were general partners in D & G, withdrew as general partners from

---

1. The Lockes and the Trustee have not answered the complaint although served with it and with a summons.

D & G in consideration for the transfer from D & G to the Lockes of D & G's 1% interest in the Lease. The Lockes assumed all management duties for the Bedford Property pursuant to the Tenancy Agreement.

For a time the Lockes managed the Property. The Non–Debtor Co–Tenant was unhappy with the Lockes' management of the Bedford Property. As a result, the Lockes agreed to delegate their management duties under the Tenancy Agreement to the Management Entity. Despite this delegation, there is no evidence that the Lockes were excused from performing their obligations under the Tenancy Agreement.

Soon after the Lockes delegated their Bedford Property management duties, they began to suffer financial setbacks. The Judgment Creditor initiated one of these setbacks by obtaining a judgment against the Lockes in an amount over two million dollars (the "Judgment"). To enforce the Judgment, the Judgment Creditor recorded a judgment lien on the Lockes' interest in the Lease and attached an assignment order to the income allocated to the Lockes pursuant to the Tenancy Agreement.

Soon after, the Lockes filed a voluntary petition for relief under chapter 7 of Title 11 on May 11, 1993. More than sixty days have passed from May 11, 1993. The Trustee has not attempted to assume or reject the Lease or the Tenancy Agreement and has not requested an extension of time to assume or reject the Lease or the Tenancy Agreement.

## III. APPLICABLE STATUTES

11 U.S.C. § 365(d)(1) provides as follows:
In a case under chapter 7 of this Title, *if the trustee does not assume or reject an executory contract* or unexpired lease of residential real property or of personal property of the debtor *within 60 days after the order for relief,* or within such additional time as the court, for cause, within such 60–day period, fixes, then *such contract or lease is deemed rejected.* (Emphasis added).

11 U.S.C. § 365(d)(4) provides as follows:
Notwithstanding paragraphs (1) and (2), in a case under any chapter of this Title, if

the trustee does not assume or reject an unexpired lease of non-residential real property under which the debtor is the lessee within 60 days after the date of the order for relief, or within such additional time as the court, for cause, within 60–days fixes, then such lease is deemed rejected, and the trustee shall immediately surrender such non-residential real property to the lessor.

11 U.S.C. § 365(g) provides in pertinent part:
Except as provided in subsections (h)(2) and (i)(2) of this section, the *rejection* of an executory contract or unexpired lease of the debtor *constitutes a breach* of such contract or lease ...

11 U.S.C. § 301 provides as follows:
A voluntary case under a chapter of this Title is commenced by the filing with the bankruptcy court of a petition under such chapter by an entity that may be a debtor under such chapter. *The commencement of a voluntary case* under a chapter of this Title *constitutes an order for relief* under such chapter. (Emphasis added).

Section 101 of Title 11 provides definitions for many terms used throughout the Bankruptcy Code. This section does not contain a definition for the term "rejection." The legislative history of § 365 of Title 11 does not contain a definition of the term rejection, nor any definitive statement regarding whether rejection pursuant to § 365 constitutes termination of an executory contract or a lease.

## IV. ISSUES

In their motions, Plaintiff and the Co–Tenant Defendants present two principal issues of law to be resolved:

A. *Is the Tenancy Agreement an executory contract within the meaning and reach of 11 U.S.C. § 365(d)(1)?;* and

B. *If the Lease and the Tenancy Agreement were deemed rejected pursuant to 11 U.S.C. § 365(d)(4) and § 365(d)(1), respectively, did that rejection terminate and extinguish the Lease and the Tenancy Agreement so that the Judgment Creditor's interest in the Lease and Tenancy Agreement was also terminated?*

My analysis of and conclusions regarding these issues are presented below.

## V. ANALYSIS OF ISSUES

### A. Is the Tenancy Agreement an executory contract within the meaning and reach of 11 U.S.C. § 365(d)(1)?

■ The language of § 365(d)(1), quoted in Section III above, supports the inference that § 365(d)(1) applies only to *executory* contracts and not to non-executory contracts.

Two commentators who have been cited widely by courts and scholars on § 365 issues assert that imposing a limit on the reach of § 365 through the word "executory" is confusing and unnecessary. Michael T. Andrew, *Executory Contracts in Bankruptcy: Understanding "Rejection"*, 59 U.Colo.L.Rev. 845, 889 (1988) ("Andrew"); Jay Lawrence Westbrook, *A Functional Analysis of Executory Contracts*, 74 Minn.L.Rev. 227, 282 (1989) ("Westbrook"). Despite the arguments of Andrew and Westbrook, the Ninth Circuit Court of Appeals has concluded that Congress placed the word "executory" in § 365 for a purpose and that purpose is to limit the scope of § 365. *In re Texscan Corp.*, 976 F.2d 1269, 1272 (9th Cir.1992), the Ninth Circuit Court of Appeals defined an executory contract to be:

> ... one on which performance is due to some extent on both sides ... [I]n executory contracts the obligations of both parties are so far unperformed that the failure of either party to complete performance would constitute a material breach and thus excuse the performance of the other.

By so defining the term "executory," the Ninth Circuit has limited the reach of § 365 to certain contracts. This definition is drawn from the legislative history of § 365, S.Rep. No. 95–989, 95th Cong., 2d Sess. 58–59 (1978), 1978 U.S.Code Cong. & Admin.News pp. 5787, 5844, 5845 and from the analysis of a respected academic whose influence is acknowledged by both Andrew and Westbrook. Vernon Countryman, *Executory Contracts in Bankruptcy (pts. 1 & 2)*, 57 Minn.L.Rev. 439 (1973), 58 Minn.L.Rev. 479 (1974).

■ The authors Andrew and Westbrook are persuasive in their arguments. Never-theless, the doctrine of *stare decisis* requires a federal trial court judge to follow the conclusions of law reached by the circuit court of appeals in the circuit which the trial judge serves. *In re Taffi*, 144 B.R. 105, 107–08 (Bankr.C.D.Cal.1992) *rev'd on other grounds*, *In re Taffi*, 1993 WL 558844 (Bankr.C.D.Cal. 1993), *appeal pending before 9th Circuit.*

### i. Executory obligations under the Tenancy Agreement

■ As mentioned in Section II above, originally the Lockes had management responsibilities for the Bedford Property under the Tenancy Agreement. The Non–Debtor Co–Tenant was unhappy with the Lockes' management and caused the Lockes to delegate those management duties. First, this delegation did not excuse the Lockes' from being ultimately responsible for the execution of their management duties. Second, this delegation had no effect on the many financial obligations of the Lockes' under the Tenancy Agreement, including:

(1) The Lockes' obligation to pay an increase in property taxes in the Bedford Property over the base year of 1984;

(2) The Lockes' promise that the Non–Debtor Co–Tenant would receive at least $111,700 each year even if the Bedford Property did not generate sufficient income;

(3) The Lockes' duty to maintain books of account regarding the management of the Bedford Property; and

(4) The Lockes' covenant to indemnify the Non–Debtor Co–Tenant in the event one co-tenant wrongfully acted on behalf of the other without expressed authority to do so.

Many of the obligations listed above were mutual obligations of both the Lockes and the Non–Debtor Co–Tenant.

Plaintiff essentially argues that upon the Lockes' delegation of management duties to the Management Entity, there were no remaining Tenancy Agreement covenants the breach of which would be material. I disagree. The Tenancy Agreement created significant financial and fiduciary interdependence between the Lockes and the Non–Debtor Co–Tenant. Each party was looking

to the other to hold up its end of a substantial bargain. The fact that the Lockes were forced to delegate their management duties under the Tenancy Agreement to the Management Entity did not relieve them of their other obligations, and there can be no argument that the Non–Debtor Co–Tenant is relieved of any of its burdens under the Tenancy Agreement.

Based upon the foregoing, I conclude that at the commencement of the Lockes' bankruptcy case, the Tenancy Agreement imposed obligations on both the Lockes and the Non–Debtor Co–Tenant so material that the breach of those covenants by one party would excuse the other from performance under the Tenancy Agreement.

**B. If the Lease and the Tenancy Agreement were deemed rejected pursuant to 11 U.S.C. § 365(d)(4) and § 365(d)(1), respectively, did that rejection terminate the Lease and the Tenancy Agreement so that the Judgment Creditor's interest in the Lease and Tenancy Agreement was also terminated?**

Before I can squarely address the issue presented, I must briefly discuss the contention of the Judgment Creditor that if a bankruptcy estate holds only a partial interest in an unexpired lease of non-residential real property then by the plain meaning of the language of § 365(d)(4), that sub-section does not apply to that partial interest.

**i. § 365(d)(4) applies to a bankruptcy estate that holds a partial interest in an unexpired lease of real property.**

Judgment Creditor's argument rests on Congress' use of the words "the lease" throughout § 365(d)(4). Judgment Creditor argues that it was Congress' intent to limit the reach of § 365(d)(4) to bankruptcy estates that hold the *entire* interest in an unexpired lease of non-residential real property. Judgment Creditor goes on to argue that if Congress intended to affect estates that hold *partial* interests in such leases, Congress could have used the words "the lease or a portion of the lease" or other, similar language.

Judgment Creditor can cite no legislative history, case law or any other authority to support this argument. This is not surprising as it is unlikely that any party or commentator has actually or hypothetically raised this issue. I conclude that this argument is not persuasive because of the policies underlying § 365(d)(4); policies that were extensively cited by Judgment Creditor in its briefs and that form the bulwark of its proposed rationale.

The moving force behind the enactment of § 365(d)(4) was the non-residential lessor industry. Non-residential lessors were not satisfied that final determinations of their interests in non-residential real property leases were being made quickly enough when non-residential lessees filed voluntary petitions for relief under chapter 11 in the Bankruptcy Code. As a result of the lobbying efforts of these non-residential lessors, Congress enacted § 365(d)(4) and imposed a 60–day deadline for debtors in possession and trustees to decide whether they would assume or reject such leases. *In re Moreggia & Sons, Inc.,* 852 F.2d 1179, 1185 (9th Cir. 1988).

If Congress enacted § 365(d)(4) to expedite determinations of lessors' interests in unexpired leases of non-residential real property, it is logical that the policy behind the statute apply not only to estates that hold the entire interest in such leases but also to estates that hold a partial interest in such leases. Otherwise, it would be possible for a clever, if not unscrupulous, debtor to transfer a partial interest in such a lease to a third party, file a voluntary petition for relief under Title 11, and escape the reach of § 365(d)(4). This cannot be what Congress intended and I conclude that § 365(d)(4) applies to the 1% interest in the Lease held by the Lockes' bankruptcy estate.

**ii. Does rejection result in the termination and extinguishment of the Lease, the Tenancy Agreement and the Judgment Creditor's interest in them?**

Based upon the foregoing findings of fact and conclusions of law, I conclude that both the Tenancy Agreement and the Lease were deemed rejected as of July 11, 1993

pursuant to § 365(d)(1) and § 365(d)(4), respectively. Now I can resolve the issue of whether that rejection terminated the existence of the Tenancy Agreement and the Lease and also Judgment Creditor's interests in the Tenancy Agreement and the Lease.

The contention that the Judgment Creditor's interest in the Lease and the Tenancy Agreement no longer exists was made by the Non–Debtor Co–Tenant when the Judgment Creditor made demand upon the Non–Debtor Co–Tenant for the Lockes' share of the Sublease income. When the Judgment Creditor pressed the Non–Debtor Co–Tenant to disclose the source for its contention, the Non–Debtor Co–Tenant pointed to recent decisions of the Ninth Circuit Court of Appeals, the Bankruptcy Appellate Panel for the Ninth Circuit and district and bankruptcy courts in the Ninth Circuit. As the instant dispute evolved, the parties have argued to each other and to me the meaning and effect of these decisions and those of other courts. My understanding of the principles of law established by these authorities is set forth below.

### a. Ninth Circuit Case Law.

The decisions of the Ninth Circuit Court of Appeals regarding § 365 are particularly important because they are controlling on my decisions. *See, In re Taffi, supra,* and because the United States Supreme Court has not ruled on any of these issues.

The first decision of the Ninth Circuit cited by the parties is *In re Moreggia & Sons, Inc.,* 852 F.2d 1179 (9th Cir.1988). The dispute in *Moreggia* involved a quasi-municipal agency that made an agreement giving the debtor "50–year use rights" in a produce market stall. The debtor filed a voluntary petition under chapter 11 and failed to assume or reject its agreement with the agency within 60 days of the commencement of the debtor's bankruptcy case. The case was converted to one under chapter 7. The chapter 7 trustee sought and obtained an order authorizing him to sell the use rights created by the agreement. The agency appealed that decision and the affirming decision of the district court to the Ninth Circuit Court of Appeals.

The Ninth Circuit concluded that the agreement was not a "lease" within the meaning of § 365, even though the court acknowledged that the agreement was a lease under California law. The court also concluded that the agreement was not an executory contract within the meaning of § 365. At the core of the court's decision in *Moreggia* is its discussion of the policy behind § 365(d)(4) found at page 1185. The court stated that the policy behind the subsection was to prevent delay, uncertainty or other harm to lessors. The court concluded that there were no such risks faced by the agency and affirmed the decision of the district court.

*Moreggia* sheds little light on the meaning of "rejection" and the specific issue of whether rejection results in termination of the lease or executory contract. The most applicable aspect of the *Moreggia* court's reasoning is the emphasis on applying § 365(d)(4) only in situations to which, in the court's view, it was meant to apply. This is a point seized upon by the Judgment Creditor in arguing that § 365(d)(4) has no role to play in this feud between itself and the Non–Debtor Co–Tenant, as neither is a lessor, the party intended to be protected by this provision of the Bankruptcy Code.

In the case of *Sea Harvest Corporation v. Riviera Land Company,* 868 F.2d 1077 (9th Cir.1989), the dispute was between a lessor and a debtor/lessee. The debtor leased tidelands from the lessor. The debtor then filed a voluntary petition for relief under chapter 11. Within 60 days of the commencement of its bankruptcy case, the debtor filed a document entitled "Affirmation and Assumption of Executory Contracts." In this document, the debtor did not pray for an order from the bankruptcy court; nor did the debtor set a hearing, give notice of a hearing or give any evidence or state any grounds why the subject agreements were eligible for assumption under § 365(b). The bankruptcy court ordered that the leases had been rejected pursuant to § 365(d)(4) and the district court affirmed the bankruptcy court's decision. The debtor appealed the district court's affirmance to the Ninth Circuit.

The parties in the instant dispute have argued long and hard over language used by the *Sea Harvest* court. It is therefore valuable to quote the applicable language:

> *Debtor suggests that even if the lease were properly 'deemed rejected' under Section 365(d)(4), this is not the same as termination of the lease.* To hold otherwise, they argue, would deprive the bankruptcy court of its power under Section 365(a) to approve the decision to assume or reject, in that a debtor in possession could passively reject a lease regardless of court approval. *A cursory examination of Section 365 immediately reveals this argument lacks merit.* Section 365(a) applies, by its terms, 'except as provided ... in subsection [ ] ... (d) of this section,' so any conflict between § 365(a) and § 365(d)(4) must be resolved in favor of the latter. Congress considered court approval of the decision to reject under § 365(a) less important than the presumption of rejection under § 365(d)(4) if the debtor in possession or trustee fails to act in 60 days.
>
> . . . . .
>
> Moreover, after a lease is deemed rejected under Section 365(d)(4), the trustee or debtor in possession must 'immediately surrender' the leased property to the lessor. 11 U.S.C. § 365(d)(4). Surrender of property, whether its use is for a retail store in a mall or a clam harvesting operation in the tidelands, has the effect of terminating the enterprise that operates there. If Congress intended passive rejection of a lease be subject to court approval, it would not have required the drastic step of immediate surrender. *Sea Harvest* at 1080–81. *(emphasis added)*

If the emphasized portions of the above text are considered out of context, it could reasonably be argued that the *Sea Harvest* court reached the issue squarely before me. Upon considering all of the quoted language, however, I conclude that the Ninth Circuit was addressing two issues that are not before me; namely, (1) whether a rejection under § 365 can be effective without a court order; and, (2) whether a rejection under § 365 results in the termination of the debtor/lessee's right to possession of the subject property. The argument made by the Non–Debtor Co–Tenant in this dispute, i.e., that the Lease and the Tenancy Agreement are terminated in all respects with regard to all parties as a result of rejection, was never presented to the *Sea Harvest* court. Therefore, the *Sea Harvest* court never ruled on that issue.

In *In re Elm Inn, Inc.,* 942 F.2d 630 (9th Cir.1991), the Ninth Circuit again faced a contest between a lessor and a debtor lessee. At one time, a principal of the debtor held a junior deed of trust in the lessee's interest in a leasehold. A hotel was operated on the subject property. The principal of the debtor foreclosed on its deed of trust interest. The principal then formed the debtor corporation and operated the hotel business located on the subject property. It was unclear whether the principal of the debtor had ever transferred his interest in the leases of the subject property to the debtor corporation.

The debtor timely filed a motion to assume the lease under § 365(d)(4). The bankruptcy court denied that motion. After 60 days had run from the commencement of the bankruptcy case, the lessors sought and obtained an order requiring the debtor to surrender the property subject to the leases pursuant to § 365(d)(4). A series of confusing procedural maneuvers followed between the lessors and the holder of the senior deed of trust on the leases. The specific order that made its way through the appellate process to the Ninth Circuit was the bankruptcy appellate panel's affirmance of the bankruptcy court's order denying the lessor's request that the bankruptcy court order the debtor/lessee to turn over the subject property to the lessor.

It is clear that this is the precise issue addressed by the Ninth Circuit when one reads the following language of the court:

> By operation of law, the debtor's possessory interest in the lease terminated on that date and the lessor's right to immediate surrender of the property simultaneously accrued. [citations]. When the [lessors] filed their application for a surrender order on August 22, therefore, they were

fully entitled to have the debtor vacate the premises.

. . .

There is, as the BAP explained, some disagreement among the courts over whether a lessor . . . can, by motion, obtain a court order to require the trustee or debtor to surrender the leased property. [citation]

. . .

The majority and far more persuasive view, however, is that such an order is available to an entitled party. . . .

. . .

As these courts have noted, the plain language and purpose of § 365(d)(4), the necessarily preemptive force of the Bankruptcy Code, and the broad equitable powers of bankruptcy judges all weigh in favor of granting a surrender order to a lessor who, under the terms of the provision, clearly deserves one. *Elm Inn* at 634.

Thus the conclusion reached by the *Elm Inn* court is that a bankruptcy court can issue an order directing turnover of property pursuant to § 365(d)(4). The Ninth Circuit also remanded the matter to the bankruptcy court for a factual determination of the rights and interests of the respective parties. *Id.* at 635.

■ The above Ninth Circuit authorities do not directly conclude that rejection under § 365 results in the termination of all the covenants, rights and remedies created by a lease or an executory contract. Rather, these decisions speak to what constitutes a lease or an executory contract within the meaning of § 365, whether rejection of a lease results in the termination of the debtor/lessee's right to possession of the property subject to the lease and whether the bankruptcy court has the authority to issue an order directing turnover to the lessor of property subject to a rejected lease. Thus there is no decisional law that binds the resolution of the instant dispute. It is helpful, then, to look at other case law in the Ninth Circuit that may be persuasive in making this decision.

### b. The Decisions of Other Courts in the Ninth Circuit.

■ The decisions of the Bankruptcy Appellate Panel of the Ninth Circuit ("BAP") do not carry the weight of *stare decisis. In re Bank of Maui*, 904 F.2d 470, 471 (9th Cir. 1990). The decisions of the BAP are binding only on the judges whose orders have been reversed or remanded by the BAP in that particular dispute. In all other instances, the decisions of the BAP are effective only to the extent they are persuasive.

In *In re Southwest Aircraft Services, Inc.,* 66 B.R. 121 (9th Cir. BAP 1986), *rev'd on other grounds,* 831 F.2d 848 (9th Cir.1987), the debtor filed and served a motion to extend the time to assume or reject a lease prior to the sixtieth day after the commencement of its bankruptcy case. The bankruptcy court concluded the extension could not be granted because the hearing on the debtor's motion was conducted more than 60 days after the commencement of the case. The debtor appealed this order. The BAP affirmed the order of the bankruptcy court. That conclusion of law was later reversed by the Ninth Circuit. In what appears to be *dicta,* the BAP also concluded that " 'rejection' normally implies termination of the debtor's interest. [§ 365(d)(4) ] is even more explicit here, however, because it adds that if the lease is deemed 'rejected' the trustee shall immediately surrender such non-residential real property to the lessor." *Southwest Aircraft* at 123.

The principal issue addressed by the *Southwest Aircraft* court was whether the 60–day period under § 365(d)(4) had to be extended by a court order prior to the running of the 60 days from the commencement of the bankruptcy case. In its discussion of the consequences of rejection, *Southwest Aircraft* court appeared to be concerned with termination of the debtor/lessee's right to possession of the subject property and was not discussing termination of all aspects of the subject lease.

The BAP also considered issues arising under § 365 in *In re Port Angeles Waterfront Associates,* 134 B.R. 377 (9th Cir. BAP 1991). In this case, the debtor leased space at a port from a municipal corporation. The

debtor spent 3.5 million dollars improving the subject property. The debtor ran into financial problems and filed a voluntary petition for relief under chapter 11. Sixty days passed and no motion to assume or reject the lease or to extend the time to assume or reject the lease was made. The debtor and the municipal corporation brought cross motions for summary judgment seeking a declaration as to whether the lease had been terminated under § 365(d)(4). The bankruptcy court concluded that the lease had been terminated. The BAP concluded that the agreement was a lease within the meaning of § 365 and that the lease was deemed rejected under subsection (d)(4). The BAP also stated that "under the Code, [the lease] is deemed rejected and terminated and the Debtor is obligated to immediately surrender possession." *Port Angeles* at 380.

It is interesting to note that a dissenting opinion was filed in *Port Angeles*. In the dissent, it was pointed out that the majority's reliance on the *Sea Harvest* decision was misplaced. In *Sea Harvest*, the debtor was in significant default under the lease and had already surrendered the property to the lessor. A careful reading of the dissent discloses that the principal objection to the conclusion of the majority is that the debtor, which had not committed any defaults under the lease, would lose the 3.5 million dollars of improvements it had made on the subject property. The dissenting member of the *Port Angeles* panel also argued that a lease is not terminated until possession of the subject property is surrendered to the lessor.

The two BAP decisions discussed above concern disputes between a lessor and a debtor/lessee. At the crux of each dispute was the right to possession of the subject premises—not termination or extinguishment of each and every covenant, remedy and right in or appurtenant to the subject lease.

A district court judge serving in the Northern District of California came close to addressing this issue in *In re Argonaut Financial Services, Inc.,* 164 B.R. 107 (N.D.Cal.1994). Therein creditors held a partial interest in a deed of trust on the debtor/lessee's interest in a leasehold. The debtor filed a voluntary petition for relief and gave inadequate notice of the bankruptcy case to the creditors. The debtor did not assume or reject the subject lease within the first 60 days of its bankruptcy case and did not extend the time to do so either. The creditor sought a retroactive extension of the deadline set in § 365(d)(4) so they would have an opportunity to protect their rights under the deeds of trust on the subject lease. The bankruptcy court denied this request.

The district court reversed the order of the bankruptcy court and gave the creditors their requested extension. The court based its ruling strictly on the lack of adequate notice. The court expressly declined to rule on the issue of whether a rejection of a lease under § 365 would terminate the lease and therefore the creditors' deed of trust interest in the lease.

Curiously, there are three decisions from the bankruptcy court in the District of Hawaii involving disputes between a debtor/lessee and a holder of a security interest in the leasehold, rather than the lessor.[2] The difference between the Hawaii cases and the instant dispute is that, in the Hawaii cases, the secured creditor held a consensual security interest while in the dispute before me the judgment creditor holds a judgment lien and an assignment order.

The first of these decisions is in *In re Hawaii Dimensions, Inc.,* 39 B.R. 606 (Bankr.D.Haw.1984). In this case, the secured creditor held a deed of trust interest in a lease. The debtor/lessee filed a voluntary petition for relief under chapter 11 and subsequently obtained an order authorizing rejection of the lease. The secured creditor brought a motion to vacate that order.

In its motion, the secured creditor argued that the rejection did not terminate the lease. The bankruptcy court concluded that rejection results in the "termination of the landlord-tenant relationship." *Hawaii Dimen-*

---

**2.** Perhaps this is explained by the fact that much of the fee title in an Hawaii real property is held by very few parties and the common and historical practice is to grant the right to possess real property through a long-term lease. *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 232–33, 104 S.Ct. 2321, 2324–25, 81 L.Ed.2d 186 (1984).

*sions* at 608. The court based this conclusion on subsection (h) of § 365 and on § 502(b)(7) of the Bankruptcy Code.

The same court faced the same issue in *In re Bernard,* 69 B.R. 13 (Bankr.D.Hawaii 1986). The only difference between *Bernard* and *Hawaii Dimensions* is that the debtor/lessee failed to act within 60 days of the commencement of its bankruptcy case and, as a result, the bankruptcy court entered an order confirming the rejection and termination of the lease. The secured creditor moved to amend that order.

In *Bernard,* the court offered reasons for reaching its conclusion that were not stated in *Hawaii Dimensions.* The court explained that if the lease were not treated as if it were extinguished by rejection, then the lease mortgagee could foreclose on the lease and thereby deprive the lessor of its ability to take possession of property subject to the lease. The court concluded that this would be contrary to the policy underlying § 365(d)(4). *Bernard* at 14–15. The *Bernard* court also concluded that the lease mortgagee had a remedy to avoid the forfeiture of its collateral—it could request abandonment of the lease under 11 U.S.C. § 554(b).[3] The court held "once the leased premises is abandoned, § 365(d)(4) is no longer applicable to said leased premises." *Bernard* at 13, 15. The court also noted that the debtor was in default under the lease and that the lease mortgagee was aware of the defaults, as well as the bankruptcy case, and did nothing to protect its interest in its collateral. *Id.* at 15.

The final decision from Hawaii is in *In re Gillis,* 92 B.R. 461 (Bankr.D.Haw.1988). In this case, a secured creditor held an assignment of rents in the debtor/lessee's interest in a lease. The debtor/lessee defaulted on its note to the secured creditor and the secured creditor proceeded to collect rents under the lease and pay the lessor. Eventually the secured creditor foreclosed on its secured interest in the lease. The debtor then filed a voluntary petition for relief under chapter 13. Sixty days passed from the commencement of the debtor's bankruptcy case without a motion to assume or reject the lease being filed and served. The lessor then brought a motion for an order confirming the rejection and termination of the lease. After many proceedings, the focus of the dispute became clear—the lessor demanded payment of its administrative claim for rent and the secured creditor was reluctant to turn over the remaining rents it had collected and was holding pursuant to court order.

In order to resolve the dispute between the lessor, the secured creditor, and the chapter 7 trustee over the remaining rents, the court found it necessary to discuss the issue of whether rejection of the lease resulted in termination of the lease. The *Gillis* court concluded that the rejection of the lease under § 365(d)(4) did indeed result in the termination of the lease. It relied upon the *Southwest Aircraft* decision by the BAP to support its conclusion. The *Gillis* court also concluded that when the lease terminated, the secured creditor's interest in the lease "extinguished" because there was nothing to which it could attach. *Gillis* at 465–66. Finally, the *Gillis* court concluded that this termination was "absolute" and unaffected by Hawaii law. *Gillis* at 465.

The Hawaii decisions are directly on point. It is therefore necessary to examine their rationales closely.

The reasoning of the *Hawaii Dimensions* court is not persuasive. That Congress decided to provide a special remedy to non-debtor/lessees in § 365(h) by giving them the option to treat the rejected lease as terminated does not shed any light on the issue of whether, without such special language, the rejection of a lease constitutes the termination and extinguishment of a lease or executory contract. Nor does the statutory formula for damages under § 502(b)(7) speak to the consequences of rejection.

The analysis in *Bernard* is also unsatisfying. It is true that the policy behind § 365(d)(4) is to provide non-debtor/lessors a quick and certain resolution of their disputes

---

**3.** 11 U.S.C. § 554(b): "On request of a party in interest and after notice and a hearing, the court may order the trustee to abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate."

with debtor/lessees. As the Ninth Circuit made clear in *Sea Harvest* and *Elm Inn,* however, this certainty is provided by the termination of the debtor/lessee's right to possession of the property subject to the lease. Nowhere in the legislative history of § 365(d)(4) is there support for the *Bernard* court's conclusion that Congress also intended to cut off the rights of secured creditor's interest in leases rejected under § 365.

█ The second part of the *Bernard* court's rationale, that a secured creditor can always seek abandonment under § 554(b) in order to avoid the effect of § 365, while true, does not bolster the *Bernard* court's conclusion that rejection results in termination of the lease. Abandonment of the lease prior to its deemed rejection may be a remedy that avoids rejection and all consequences of it. *But see, In re Austin Development Co.,* 19 F.3d 1077, 1081, footnote 5 (5th Cir.1994). (*Bernard* court's proposed remedy seems "unnecessarily contrived"). A remedy is necessary, however, only if one has suffered or will suffer harm. To argue that the existence of a remedy establishes the existence of the harm begs the threshold question.

Finally, the only new support for the conclusions offered by the *Gillis* court is the reasoning in *Southwest Aircraft.* As discussed above, the BAP's decision in *Southwest Aircraft* dealt primarily with the issue of when an order must be entered in order to effectuate an extension of the § 365(d)(4) deadline. Its *dicta* regarding the effect of rejection was limited to the termination of debtor/lessee's right to possession of the property subject to the lease and that *dicta* was unsupported by any authority.

There is one other decision published by a court of the Ninth Circuit regarding the issue before me in this dispute, *In re Picnic 'N Chicken, Inc.,* 58 B.R. 523 (Bankr.S.D.Cal. 1986). In *Picnic,* the debtor in possession lessee requested an order rejecting its lease and also an order declaring that once the lease was rejected, the land subject to the lease would be free of the lease. The creditor that held the security interest in the lease objected to the second request and argued that rejection of a lease does not terminate it.

The *Picnic* court concluded that rejection does not result in termination of a lease. The court based its conclusion on the following analysis:

1. Under California law, a breach is not synonymous with termination;
2. the drafters of the Bankruptcy Code used the terms of "breach" "termination" throughout section 365 for different purposes; and
3. non-Ninth circuit case law was more persuasive to the *Picnic* court than the *Hawaii Dimensions* decision discussed above. *Picnic* at 525–26.

The rationale for the decision in the *Picnic* case is not completely persuasive. First, it is unclear how the California law of contracts helps us to understand the doctrine of rejection, which is found only in the Bankruptcy Code. Second, in discussing the non-Ninth circuit case law it relies upon, the *Picnic* court indicates that the appropriate approach to statutory construction is to avoid inequity. Such an approach leads inconsistent and contrary results.

The only firm conclusion I can reach based upon the foregoing case law, specifically *Sea Harvest,* is that a debtor/lessee's right to possession of property subject to a lease is terminated upon the rejection of the lease under § 365. When courts of the Ninth Circuit have directly faced with the issue of whether rejection results in the termination of all the covenants, rights and remedies that constitute a lease or an executory contract, the court either declined to address the issue, as in *Argonaut,* or failed to provide a persuasive rationale for its conclusion, as in *Hawaii Dimensions, Bernard, Gillis,* and *Picnic.*

Based upon the foregoing, I conclude that rejection of a lease under § 365 results in the termination of the debtor/lessee's right to possession of the property subject to the lease. As to the other effects and consequences of rejection, I must turn to decisions of other courts and the scholarship of commentators who have addressed this issue.

### c. Other Case Law and Commentary.

The most pertinent and recent decision outside the Ninth Circuit is *In re Austin*

*Development Co.,* 19 F.3d 1077 (5th Cir. 1994). In it, the Fifth Circuit Court of Appeals considers and addresses most of the other applicable case law issued by the non-Ninth Circuit courts. In *Austin Development* the debtor was a non-residential lessee. The debtor borrowed money from a secured creditor and gave a deed of trust in the debtor's interest as a lessee in a ground lease and the debtor's interest as a sublessor in a sublease to the secured creditor.

The debtor defaulted on its obligations to the secured creditor and filed a voluntary petition for relief under chapter 11. The debtor failed to assume or reject the lease or sublease within the 60 days following the commencement of its bankruptcy case. Subsequently, the lessor requested and obtained an order terminating the debtor's interest in the ground lease as lessee and also of the secured creditor's deed of trust interest in the lease.

The secured creditor appealed this order to the district court. The district court affirmed the bankruptcy court and the appeal was taken to the Fifth Circuit Court of Appeals. The circuit court straightforwardly stated the issue before it: "does the rejection terminate the lease and thus extinguish a security interest taken and the debtor's interest in the lease, a sublease by the debtor/lessee, or similar rights that accrued by and among third parties?" *Austin Development* at 1080.

After stating the issue, the *Austin Development* court noted that many courts had decided that rejection does result in termination of the entire lease and all interests appurtenant to it and that many other courts had concluded to the contrary. In reaching its conclusion, the *Austin Development* court followed a line of analysis that surprisingly was unexplored by some of the courts whose decisions are discussed above, namely, why does the power of rejection exist and how is that power expressed in the plain language of § 365? The following language from the *Austin Development* decision is instructive:

This court's interpretation relies instead on those cases that have construed the plain meaning of § 365 understood in light of its terms, which together expressed the Con-

gressional purpose behind the trustee's assumption and rejection power. [footnote] [citation] Section 365 derives from § 70(b) of the former Bankruptcy Act, a provision that broadly codified the common law doctrine that allowed the trustee either to assume and perform the debtor's leases or executory contracts or to 'reject' them if they were economically burdensome to the estate. [citation to *Andrew*] This court has held that the deemed rejection of a lease under § 70(b) did not terminate the lease but merely placed the trustee's obligation to perform under the leasehold outside the bankruptcy administration without destroying the leasehold estate. *In re Garfinkle,* 577 F.2d 901, 904 (5th Cir.1978). Consequently on facts similar to those in the instant case, *Garfinkle* held that the mortgage of the original lessee from whom the bankrupt acquired the leasehold was preserved notwithstanding an attempted rejection. *Id. Garfinkle's* analysis remains persuasive, as § 70(b) and § 365(d)(4) do not materially differ in the way they effectuate the assumption and rejection power. [citations]

Turning to § 365, the terms rejection, breach and termination are used differently, but not inconsistently or interchangeably, as some courts have suggested. [citation] Throughout § 365, rejection refers to the debtor's decision not to assume a burdensome lease or executory contract. Section 365(g) states that rejection of a lease 'constitutes a breach' except as provided in subsections (h)(2) and (i)(2). Three circuits, including this one, have held that this language does not mean that the executory contract or lease has been terminated, but only that a breach has been deemed to occur. *In re Continental Airlines,* 981 F.2d 1450, 1459 (5th Cir. 1993) ('to assert that a contract effectively does not exist as of the date of rejection is inconsistent with deeming the same contract breached'); *In re Modern Textile, Inc.,* 900 F.2d 1184, 1194 (8th Cir.1990); *Leasing Services Corp. v. First Tennessee Bank, National Ass'n,* 826 F.2d 434, 436–37 (6th Cir.1987) [footnote].... The decision to reject is thus correctly viewed only

as a 'power to breach' the executory contract or lease. As one commentator put it, [w]hat the estate's representative is rejecting is the contract or lease asset, which conceivably could carry continuing obligations with it into the estate on an administrative basis. Rejection simply prevents the estate from unadvisedly stepping into such liabilities. The liabilities are not repudiated; to the contrary, as the rejection-as-breach doctrine is designed to insure, the contractor lease liabilities remain intact after rejection and give the non-debtor party a claim in the distribution of the estate. [citation to *Andrew*].

Further, Congress knew how to authorize the termination of executory contracts and leases in § 365. 'Termination' is used in § 365(h)(i) and (n) as one option available respectively to the purchaser of an interest in a time share project, the vendee of real property, or the licensee from the debtor of a right to intellectual property if the trustee has rejected the executory contract. Accordingly, the trustee may reject any of these contracts, but termination does not occur except at the other party's option. The option to terminate a time share lease, § 365(h)(i), or a license § 365(n)(1)(A), arises where the trustee's rejection 'amounts to such a breach as would entitle the [party] to treat such lease or [contract] as terminated by virtue of its own term, applicable non-bankruptcy law or other agreements . . .' Under an objective reading, the provisions of § 365 may be redundant and complex, but Congress was not confused in its differing usages of the terms rejection, breach and termination. *Austin Development* at 1081–83.

To bolster its textual analysis, the *Austin Development* court also addressed the inequitable results that would flow from concluding that a consequence of rejection is termination of the entire leasehold interest. The court noted that the policy behind § 365(d)(4) was focused on disputes that arise between lessors and lessees. The court concluded that it would be "capricious" to construe § 365(d)(4) in such a way that it resulted in a forfeiture of an interest in property by a secured creditor through the automatic operation of law and without any procedural protection. *Aus-

tin Development* at 1083. Such a result would be absurd because Congress enacted § 365(d)(4) only to address problems that arise between lessors and lessees. *Id.* at 1083.

What is persuasive about much of the analysis in *Austin Development* is that the court focuses on the purposes underlying the rejection power in general and on reading § 364(d)(4) in the context of the entire section. By doing this, the *Austin Development* court makes plain the meaning of the term rejection and the consequences of rejection that have been commonly understood for decades by both scholars and courts. This line of inquiry is more sound than one that attempts to define the entire doctrine of rejection by looking only at the effect of one subsection, (d)(4), enacted to address the limited concerns of a very small class of parties affected by the Bankruptcy Code.

This historical and holistic approach is also the one taken in *Andrew* and *Westbrook.* In *Andrew* and *Westbrook,* the authors provide lengthy and in-depth reviews of the statutory and case law that created and defined the powers of rejection and assumption now codified in § 365. There is little or no value in my recapitulating those reviews. It will suffice to recount the pertinent conclusions reached in both *Andrew* and *Westbrook* regarding the conception, meaning and consequences of the doctrine of rejection:

(1) Through published decisions, judges created the doctrine of rejection to enable the fiduciary in charge of an insolvency estate to free that estate from the obligations imposed by contracts or leases of the insolvent entity; *Andrew,* 59 U.Colo.L.Rev. 845, 856–866; *Westbrook,* 74 Minn.L.Rev. 227, 247–255.

(2) Prior to the enactment of the Bankruptcy Code in 1978, executory contracts and leases did not become property of the bankruptcy estate unless and until they were assumed. If a lease or executory contract were never assumed, it was conceptually difficult to establish a basis for the non-debtor party to the lease or contract to assert a claim against the bankruptcy estate. This difficulty was solved by the Supreme Court

in its decision of *Central Trust Company v. Chicago Auditorium Ass'n,* 240 U.S. 581, 36 S.Ct. 412, 60 L.Ed. 811 (1916) in which the Court concluded that rejection of a lease or executory contract also constituted a breach of that lease or contract. This conclusion provided the rationale for asserting a claim against the bankruptcy estate by the non-debtor party to the lease or contract and was also the foundation for the language found in § 365(h); *Andrew* at 866–881; and,

(3) Based upon the foregoing fundamental principles underlying the creation and purpose of the rejection doctrine, there is no support for the proposition that rejection of a lease or executory contract results in the termination of any property interest created by or appurtenant to the lease or executory contract, except as specifically provided otherwise in § 365. *Andrew* at 881–889; *Westbrook* at 257–279.

The authorities cited in *Andrew* and *Westbrook* to support the above conclusions are persuasive and I adopt the conclusions based upon them.[4]

There are many extraordinary powers provided to trustees and debtors in possession under the Bankruptcy Code. *See e.g.,* powers to avoid transfers of property both before and after commencement of a bankruptcy case, §§ 544, 547, 548 and 549. In each instance, these powers are provided by Congress to insure that the property that constitutes the bankruptcy estate is fairly distributed and that the administration of bankruptcy cases is carried out efficiently. Because these powers are extraordinary, they must be limited to the scope intended by Congress. In construing and applying the statutes that create these powers courts must be careful not to expand the scope of these statutory powers beyond what is necessary and consistent with the intent of Congress.

This is the approach I choose to take in construing the meaning and consequences of the term "rejection" as used in § 365(d)(1) and (d)(4). The doctrine of rejection was created to enable bankruptcy estate fiduciaries to free the estates under their control from the onerous obligations of executory contracts and leases. To accomplish that goal, it is not necessary to conclude that the rejection of executory contracts and leases results in the extinguishment of those executory contracts and leases. Of course, Congress can always change that rule or make exceptions to it. The Ninth Circuit Court of Appeals has concluded that one exception to this rule is that the debtor's and the bankruptcy estate's right to possess

---

4. I depart from the *Andrew, Westbrook* and *Austin Development* approach in one respect. In *Andrew* and *Westbrook,* the authors conclude that a decision to reject by a trustee or debtor in possession is "nothing more than the label for the decision not to assume," *Andrew* 59 U.Colo. L.Rev. at 861, or, alternatively, rejection is "the decision to breach." *Westbrook* 74 Minn.L.Rev. at 280. The *Austin Development* court adopted the conclusion reached in *Andrew. Austin Development* at 1083. Based on the authorities cited in both *Andrew* and *Westbrook,* I disagree with the above characterizations of what it means to reject an executory contract or lease.

The primary purpose of creating the doctrine of rejection was to enable a bankruptcy estate fiduciary to free the estate from the obligations and covenants created by an executory contract or lease. This power to unshackle the estate from unfruitful contractual burdens seems to me to be an exercise of a statutory power rather than the decision not to exercise power, which is how the author in *Andrew* describes rejection. Assumption under § 365 is the power to compel a non-debtor party to a contract or lease to remain in contract with the bankruptcy estate and, if appropriate under § 365(f), with an assignee that does not have the consent of the non-debtor party to the contract. Rejecting an executory contract or lease is more than the decision not to accept the responsibilities imposed by that executory contract or lease; it is the separate and independent power to free the estate of those burdens and to limit the non-debtor party to certain remedies against the bankruptcy estate.

My understanding of the effect of rejection is also different from that of the author in *Westbrook.* In *Westbrook,* the author concludes that rejection is nothing more than the power to breach an executory contract lease. It does not seem necessary for Congress to enact a statute to give a bankruptcy estate fiduciary the ability to breach an executory contract or lease. If a bankruptcy estate fiduciary did not carry out the obligations existing under an executory contract or lease that came into the bankruptcy estate, then a breach would occur with or without the fiduciary's "decision to breach." Further, a simple breach does not excuse or free the party to a contract from its obligations under the contract, although it may free the non-breaching party from any future performance.

property subject to a non-residential lease subject to § 365(d)(4) is terminated upon the deemed rejection of that non-residential lease. The termination of the debtor's and the estate's right to possession is consistent with and accomplishes the goal behind the enactment of § 365(d)(4).

The value of this approach is apparent when applied to the facts of the instant dispute. Apparently the Trustee saw no benefit to the estate in assuming the Lease or the Tenancy Agreement. As a result, the Lease and Tenancy Agreement were deemed rejected and the estate was free of all of its obligations under those agreements. The Non–Debtor Co–Tenant has not provided me with any evidence establishing that the lessor under the Lease has any desire or interest in the termination of *any* of the debtor's or the estate's rights under the Lease or the Tenancy Agreement. Obviously, this is because the Non–Debtor Co–Tenant, who holds 99% of the lessee's interest in the Lease, is apparently carrying out all of the lessee's obligations under the Lease and apparently continues to possess 100% of the property subject to the Lease. The absurdity of the Non–Debtor Co–Tenant's position is exposed when pushed to its extreme: If the Lockes' interest in the Lease no longer exists, yet the Non–Debtor Co–Tenant continues to possess 100% of the Bedford Property, then the Non–Debtor Co–Tenant would be unlawfully holding the 1% interest in the Bedford property formerly held by the Lockes and their bankruptcy estate.

To the extent that the lessor under the Lease wishes to regain possession of 1% of the Bedford property, it is entitled to an order from me directing that turnover because the Lockes' bankruptcy estate no longer had any right to possess that partial interest. The lessor has never requested such an order and apparently does not need or want it.

 I reach a similar conclusion regarding the effect of rejection on the Tenancy Agreement. The Trustee apparently concluded that there was no benefit to the estate in assuming the obligations under the Tenancy Agreement. As a result, the Tenancy Agreement was deemed rejected under § 365(d)(1) and the estate was freed of any obligations imposed on it by the Tenancy Agreement. Under § 365(h), this rejection of the Tenancy Agreement is deemed a breach of it and creates the conceptual basis for the assertion of a claim against the bankruptcy estate by any parties harmed by that breach. Thus, the two goals behind the creation and development of the doctrine of rejection have been accomplished. To conclude that any other consequence flows from rejection would be unnecessary in light of the above analysis.

 It is possible that the Non–Debtor Co–Tenant could argue that as a result of my decision, it cannot rid itself of the Judgment Creditor's leech-like draining of the income generated by the Sublease. The Non–Debtor Co–Tenant would argue that this is inequitable because, unlike a creditor who takes a consensual security interest in a leasehold, the Judgment Creditor is able to drain off benefits from the Lease, Tenancy Agreement and Sublease without undertaking any of the burdens that a mortgagee would undertake in the event of foreclosure on a leasehold interest.

 To the extent this hypothetical question becomes an actual one, there is a simple answer. Because the Lease and the Tenancy Agreement are essentially left undisturbed by their rejection, the Non–Debtor Co–Tenant can pursue any and all of its remedies under non-bankruptcy law with regard to those agreements once the automatic stay of 11 U.S.C. § 362(a) [5] ends either by operation

---

5. Section 362(a):

Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970, operates as a stay applicable to all entities, of—

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose

of statute [6] or by the Non–Debtor Co–Tenant obtaining an order terminating the stay under § 362(d).[7] The only other constraints on the Non–Debtor Co–Tenant pursuing its remedies under the Tenancy Agreement and

> before the commencement of the case under this title;
> (2) the enforcement, against the debtor or against property of the estate, of a judgment obtained fore the commencement of the case under this title;
> (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;
> (4) any act to create, perfect, or enforce any lien against property of the estate;
> (5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;
> (6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;
> (7) the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor; and
> (8) the commencement or continuation of a proceeding before the United States Tax Court concerning the debtor.

**6.** Section 362(c):

> Except as provided in subsections (d), (e), and (f) of this section—
> (1) the stay of an act against property of the estate under subsection (a) of this section continues until such property is no longer property of the estate; and
> (2) the stay of any other act under subsection (a) of this section continues until the earlier of—
> > (A) the time the case is closed;
> > (B) the time the case is dismissed; or
> > (C) if the case is a case under chapter 7 of this title concerning an individual or a case under chapter 9, 11, 12, or 13 of this title, the time a discharge is granted or denied.

**7.** Section 362(d):

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;
> (2) with respect to a stay of an act against property under subsection (a) of this section, if—
> > (A) the debtor does not have an equity in such property; and
> > (B) such property is not necessary to an effective reorganization; or

the Lease would be the discharge provided to the Lockes under § 524(a) [8] and, with regard to any claim asserted against the bankruptcy estate, the damages formula set forth in § 502(b)(7) [9]. In other words, there is noth-

> > (3) with respect to a stay of an act against single asset real estate under subsection (a), by a creditor whose claim is secured by an interest in such real estate, unless, not later than the date that is 90 days after the entry of the order for relief (or such later date as the court may determine for cause by order entered within that 90-day period)—
> > > (A) the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or
> > > (B) the debtor has commenced monthly payments to each creditor whose claim is secured by such real estate (other than a claim secured by a judgment lien or by an unmatured statutory lien), which payments are in an amount equal to interest at a current fair market rate on the value of the creditor's interest in the real estate.

**8.** Section 524:

> (a) A discharge in a case under this title—
> (1) voids any judgment at any time obtain, to the extent that such judgment is a determination of the personal liability of the debtor with respect to any debt discharged under section 727, 944, 1141, 1228, or 1328 of this title; whether or not discharge of such debt is waived;
> (2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived; and
> (3) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect or recover from, or offset against, property of the debtor of the kind specified in section 541(a)(2) of this title that is acquired after the commencement of the case, on account of any allowable community claim, except a community claim that is excepted from discharge under section 523, 1228(a)(1), or 1328(a)(1) of this title, or that would be so excepted, determined in accordance with the provisions of sections 523(c) and 523(d) of this title, in a case concerning the debtor's spouse commenced on the date of the filing of the petition in the case concerning the debtor, whether or not discharge of the debt based on such community claim is waived.

**9.** Section 502(b)(7):

> if such claim is the claim of an employee for damages resulting from the termination of an employment contract, such claim exceeds—

ing preventing the Non–Debtor Co–Tenant from pursuing its remedies under non-bankruptcy law to terminate the Tenancy Agreement in order to free the income generated by the Sublease from the lien of the Judgment Creditor, to the extent non-bankruptcy law provides any such remedy. The Non–Debtor Co–Tenant of course cannot pursue any claim for personal liability against the Lockes because of the discharge of § 524(a) and is limited in any claim it can assert against the bankruptcy estate by the damages formula found in § 502(b)(7).

█ An alternative remedy available to the Non–Debtor Co–Tenant is the one it is suggested for the Judgment Creditor—seeking an order compelling the Trustee to abandon the estate's interest in the Lease and the Tenancy Agreement under § 554(b). If such an order were obtained, the control over these agreements and the assets affected by them would pass from the bankruptcy estate to the Lockes. At that point, the Non–Debtor Co–Tenant could pursue its remedies under non-bankruptcy law subject to the restrictions discussed in the paragraph above.

## VI. CONCLUSION

█ Based upon the forgoing I conclude that rejection of an executory contract or lease under § 365 does not result in the termination or extinguishment of the covenants, rights, or remedies created by the executory contract or lease, or, of any property interests appurtenant to the executory contract or lease. Accordingly, the interest held by the Judgment Creditor in the Lease and Tenancy Agreement was not terminated or extinguished by the rejection of the Lease and the Tenancy Agreement.

(A) the compensation provided by such contract, without acceleration, for one year following the earlier of—
(i) the date of the filing of the petition; or
(ii) the date on which the employer directed the employee to terminate, or such employee terminated, performance under such contract; plus
(B) any unpaid compensation due under such contract, without acceleration, on the earlier of such dates.